SOUTHERN RY. CO. v. HUBBARD BROS. & CO.

(Circuit Court of Appeals, Sixth Circuit. February 13, 1907.)

No. 1,497.

CARRIERS—ACTION FOR LOSS OF GOODS—EVIDENCE OF DELIVERY TO CARRIER.

A former opinion reaffirmed on rehearing, affirming a judgment against defendant railroad company for a loss of cotton delivered to a compress company on its account by a connecting carrier which received the same under a contract for through transportation over its own and defendant's lines, with privilege to compress the same en route, there being evidence that such delivery was in accordance with the usual course of business between the two carriers, and that it was defendant's custom to accept delivery to the compress company as delivery to itself, and that although it was notified of such delivery in the present case, and given the waybills and its share of the freight, it made no objection, and where it was further shown that defendant had a contract with the compress company to receive and compress cotton and load it in defendant's cars, and making the compress company responsible to it for any loss or injury to the cotton while in its possession.

On rehearing.

For former opinion, see 146 Fed. 31.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. On June 5, 1906, the opinion of this court on the original hearing was handed down. It is reported in 146 Fed. 31. The plaintiff in error filed a petition for rehearing, upon consideration of which and the suggestion that a number of other claims amounting in value to a large sum, of like character with that which formed the basis of this action, were depending, and that the determinations herein made would constitute a precedent for the adjustment or trial of those, we granted a rehearing; and the cause has been elaborately reargued. We have given the case, in all its aspects, our attentive consideration. But we are not convinced that our former decision was erroneous. With respect to the facts there stated no mistake is shown.

Further and more minute examination of the record discloses some additional grounds and reasons, but they are confirmatory of the conclusions then reached. We will restate the case and questions in the added light thrown upon them by the rehearing.

First, with respect to the contract on which the transportation was undertaken. The cotton was delivered by Smith & Coghlan at Nettleton, Miss., to the Kansas City, Memphis & Birmingham Railroad Company, to be carried by it and its connecting carriers to New York and there delivered to the defendants in error upon the production of the bill of lading properly indorsed. The freight through was prepaid by the consignors. By the bill of lading the above-named railroad company agreed to carry the cotton to Birmingham, Ala., and there deliver it "to another carrier on the route to its destination," and it was declared that the conditions of the contract should be applicable to each successive carrier severally. The description of the articles, rate of freight, destination, the consignee, and the expectation that the cotton would be compressed at Birmingham was shown by the following notation in the bill of lading:

The rate of freight from Nettleton, Miss., to New York, N. Y., is in cents. If special, 82.

| Consignee. Destination. | Articles. | Weight.<br>(Sub. to Cor.) |
|---|---|---|
| To order notify Hubbard Bros. & Co., New York, N. Y.................... | 100 bales cotton | 50,000 |
| "Lighterage Free"..................... | Frt. prepaid | |
| 100 O X E 1-100...................... | $410.00 | |
| Compress at Railroad | | |
| Compress Birmingham, Ala. | | |

The waybills which accompanied and directed the incidents of the transportation contained these and other particulars. One of the conditions of the contract was this:

"Each carrier, over whose route cotton is to be carried hereunder, shall have the privilege of compressing the same, and shall not be held responsible for deviation or unavoidable delays in procuring such compression."

It was testified that the statement of the place where the compression was to be done was merely a designation for the direction of the employés of the transportation company. And this, in view of the facts, seems a not unreasonable interpretation of it.

There was evidence tending to show, and from which the jury might have found, that the usage of business in such transportation of cotton from that part of the cotton-growing country to New York and other far eastern ports was to compress it at some nearby point for greater convenience in carrying. An illustration appears in this case, where five cars carried to Birmingham only 50,000 pounds of cotton not yet compressed. And, in the present case, this cotton shipped from Nettleton would in the common order of business be compressed at Birmingham. This fact is noted in the bill of lading. A condition of the bill of lading was that those engaged in the transportation might compress it or not, as they should elect. The concern of the shipper was to have the cotton carried to New York. That of the carriers was to carry it at as little cost to themselves as possible. And we may here note that the contract of the initial carrier was to deliver it to the succeeding car-

rier, and there was no stipulation with or for any other party than carriers, except that the owner should be chargeable with the cost incurred by any quarantine regulations. The manner in which the contract was performed in this instance, and it was the usual manner, confirms this construction of the agreement, namely, that the compression of the cotton was not done for the shipper but for the carrier, who was to take it for the long carriage from Birmingham to New York, and for its economy. When the cotton arrived at Birmingham it was delivered to the Belt Line, to be turned over to the compress company, and it was so delivered. But the Kansas City, Memphis & Birmingham Railroad Company, after it had delivered the cotton to the Belt Line, notified the Southern Railway Company that the cotton had been delivered to the Belt Line to be taken to the compress, passed the waybills to the railway company, and turned over the unearned freight money to the latter; no deduction being made for the compress company. And all this was according to the common course of business between these two railroad companies in such cases; that is to say, of transportation by the first to be continued by the other from Birmingham. In view of the circumstances stated, it might well have been inferred by the jury that this cotton was delivered by the Kansas City, Memphis & Birmingham Railroad Company to the Belt Line to be taken to the compress by the authority of the Southern Railway Company, for it is not too much to say that the adoption of the usage was a sufficient authority for acts done in pursuance of it, unless there was something to show that there was some change in the circumstances or some notification to the contrary. With respect to the facts we repeat what we have said, there was evidence from which the jury might have found them.

But, secondly, the contract between the Southern Railway Company and the compress company affords very cogent evidence, as we think, that the latter did not stand in the relation of a contractor with the shipper, and did not in any legal sense act, nor was it expected to act, as the agent of the shipper; but, on the contrary, was doing it, or was expected to do it, as the agent of the Southern Railway Company. It was an incident of the carriage, which carriage was to be performed by the railway company. By reference to this contract, which is copied in our former opinion, it is stated in the preliminary recitals that the railway company "will, during the approaching season, accept uncompressed cotton for through transportation, but for convenience in forwarding the same, desires that a portion thereof shall be compressed, at the compress of the compress company"; and then, by paragraph 1, the compress company agrees that, when requested by the railway company, it will unload the cotton from cars or wagons and compress it, and then load it on the railway company's cars, as might be directed by it. Then follow, in that and subsequent paragraphs, particular stipulations about the manner in which the compressing and loading of the cotton upon the company's cars shall be done. By paragraph 5, the compress company stipulates that it will indemnify the railway company against any and all claims, demands, suits, judgments, and sums of money accruing to any person against the railway company while the cotton is in possession of the compress company. By paragraph 6, it agrees to pay to the railway company all sums paid by the latter for insurance on

the cotton while in the possession of the compress company. By paragraph 8, it agrees to give the railway company a bond with sureties for the faithful performance of the contract. Thereupon the railway company agrees to pay the compress company at certain specified prices for the services to be performed by the latter, with a proviso that:

"When the railway company shall issue its bill of lading for compressed cotton to be delivered to it for shipment at the compress of the compress company, then the compress company shall look to the shipper of such cotton for its charges, and not to the railway company."

It is contended on behalf of the railway company that the contract concerned only cotton originally shipped from Birmingham on the railway company's own bills of lading, and not cotton received from other railways for further transportation. But there was nothing in the character of the business which would make it probable that such a distinction should be intended, and the stipulation to unload the cotton from "cars and wagons," and for the collection of the cost of compressing cotton received at Birmingham and shipped from there on the Southern Railway Company's bill of lading, distinctly show that the contract was intended to cover cotton received from other railways as well as from local shippers. Or, if this were doubtful, the action of the parties under it would help out the uncertainty. It seems clear that the compress company, in receiving, compressing, and reloading cotton upon the railway company's cars under this contract, was an employé of the latter, and that it would be wholly unreasonable to regard it as performing the service either as an agent for, or as an independent contractor undertaking them for, the shipper.

Another contention is that there was no request of the railway company that this cotton should be sent to the compress, and that the railway company was given no opportunity to elect whether it would have the cotton compressed. To this there are two answers. In the first place, if the jury should find, as there was evidence tending to show, that it was the customary thing, in the course of business between the Kansas City, Memphis & Birmingham Railroad Company and the Southern Railway Company, for the former to send to the compress cotton intended for transportation to New York by the Southern Railway Company, the request of the latter that this cotton should be sent to the compress might well have been implied. And, in the second place, the Southern Railway Company was forthwith notified by the Kansas City, Memphis & Birmingham Railroad Company that it had sent this cotton into the compress, and that its destination was New York. The waybills were delivered to the Southern Railway Company, and the freight money, less the charges incurred before the delivery to the compress, was paid or credited to it in current accounts. This notification and the delivery of waybills were made on March 14, 1903, or possibly the day following, for a manifest containing the number and initials of the cars, weights, and description of the contents with full particulars and with directions, bearing date March 15, 1903, was sent by the Southern Railway Company to the compress company. On the trial the railway company denied that it received notice of the sending of the cotton into the compress until March 27th, and it is possible that this was so. The jury was to find how the fact was. But it is not very

material. The railway company did not repudiate what had been done, nor did it raise any objection until the loss of the cotton came to be apprehended, several weeks later.

In support of its contention that the delivery to the compress company was not a delivery to it, the railway company relies specially upon the authority of the case of Arthur v. Texas & P. Ry. Co., 139 Fed. 127, 71 C. C. A. 391, decided by the Circuit Court of Appeals for the Eighth Circuit. But the facts in that case in respect to which the decisive question arose were very different from those in the pending cause. The action in that case was instituted to recover from the railroad company the value of 50 bales of cotton, which had been delivered, as was claimed, to it at Texarkana to be carried by it and its connections to Utica, N. Y. The cotton in question was brought in by local buyers for compression and shipment at Texarkana, and was unloaded upon the platform of the Union Compress Company, a corporation. organized for compressing cotton preliminary to its shipment. It was intended that the cotton should be taken over its route by the defendant, the railroad company. Two days after it was left upon the platform, and before its compression, it was consumed by fire through the negligence of the compress company, and the shipper sought to hold the railway company for the loss, upon the ground that the compress company was its agent for receiving cotton for transportation, and that the railway company, upon the certificate of the compress company showing the receipt of the cotton by the latter, issued its bill of lading to the shipper, in which was a stipulation like that in the present case giving each carrier the privilege of compressing the cotton. But this stipulation would seem to have been nugatory in that case, because the cotton was already in the hands of the compress company for compression. The compress company had no contract or other relation with the railway company except that a compulsory rule of the Texas Railroad Commission, requiring railway companies to issue receipts for, and take charge of, all cotton delivered upon the platforms of compress companies situated upon its track. The court held that it was beyond the power of the railroad commission to impose a liability upon the railway company for the acts of the compress company, which was, as the court held, an independent actor. That ruling, of course, released the railroad company from any liability on account of the receipt of the cotton by the compress company. And the court held that the railway company was not precluded by its receipt and bill of lading from proving that in fact it had not received the cotton—a proposition well settled by authority. In that case the compression was to take place before the cotton came into the possession of the carrier, while in this it was a privilege which must be exercised, if at all, while the carriage was going forward. But the essential difference between the cases is that in that case the compress company was an independent contractor and was doing the work for the shipper, while in this it was serving the carrier under a contract of hire for which service its compensation was paid by the carrier. It is clear, therefore, that the decision in that case is not an applicable precedent. And no other case more relevant is cited by counsel, or has been found by us.

It is suggested that, in the circumstances stated, even if the compress company held the possession of the cotton as the agent of the Southern Railway Company, such possession was held in the character of a wareant in either character, and not of a carrier. But, as no exoneration of the defend-Moreover, the distinction was attempted, the suggestion avails nothing. Moreover, the distinction was not adverted to upon the trial. For these reasons we do not consider the point further.

One incidental question which we have left by the way is presented by the contention for the plaintiff in error that the bill of lading issued by the Kansas City, Memphis & Birmingham Railroad Company was not proven at the trial; and perhaps the record bears this contention out. We do not critically consider how this may be, for the declaration makes profert of the bill of lading and sets it out verbatim. The only proper pleas of the defendant, the Southern Railway Company, confess the bill of lading as set out on over, and aver matter in avoidance.

We are therefore constrained to ad        , and the judgment entered thereon will ḥere to our former opinion, and                  ot be disturbed.