## SOUTHERN RY. CO. v. HUBBARD BROS. CO.

### (Circuit Court of Appeals, Sixth Circuit. June 5, 1906.)

#### No. 1,497.

CARRIERS—ACTION FOR LOSS OF GOODS—EVIDENCE OF DELIVERY TO CARRIER.

Defendant railroad company made a contract with a cotton compress company located on a belt line at Birmingham, Ala., reciting that defendant would receive uncompressed cotton for shipment, but for convenience desired a portion of the same compressed, and providing that the compress company would receive and receipt for such cotton from defendant or shippers, compress the same, and load it in cars of defendant, as directed, for which it was to receive payment as therein fixed. It also agreed to be responsible to defendant for any loss or damage to such cotton while in its possession. A through shipment of cotton was made from a point in Mississippi to plaintiff at New York by way of Birmingham, and thence over defendant's road. The initial carrier delivered the cotton to the belt line road, which delivered it to the compress company. The first carrier then paid to defendant its share of the freight, and delivered to it the compress company's receipts. The cotton was not delivered by the compress company to defendant, and was never received by plaintiff, which brought an action against defendant for its value. Aside from such contract, there was evidence of a custom of the initial carrier to make deliveries of cotton to defendant at Birmingham in the manner pursued in this instance. *Held*, that such evidence warranted the submission to the jury of the question whether the delivery of the cotton to the compress company constituted a delivery to defendant, either because of an agency to receive it, created by the contract, or by the custom which the evidence tended to prove.

In Error to the Circuit Court of the United States for the Western District of Tennessee.

Caruthers Ewing, for plaintiff in error.
Henry Craft, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. The plaintiffs, who are citizens of the state of New York, and whose place of business is the city of New York, brought this action against the Kansas City, Memphis & Birmingham Railroad Company, the St. Louis & San Francisco Railroad Company, and the Southern Railway Company, to recover damages for the loss of 100 bales of cotton delivered by Smith & Coughlan to the first-named company at Nettleton, Miss., to be carried by that company and connecting carriers to New York, and there delivered to the plaintiffs. The Kansas City, Memphis & Birmingham Railroad connected directly at Birmingham, Ala., with the Southern Railway. It also connected at Birmingham with the Belt Railroad, operated by the St. Louis & San Francisco Railroad Company, over which cotton intended to be compressed before further transportation was carried to the works of the compress company, where, after being compressed, it was delivered to the next carrier. The 100 bales of cotton referred to were received for shipment at Nettleton, March 6, 1903, and a bill of lading issued showing the consignment of the cotton to the plaintiffs. A draft on the plaintiffs for $4,000 was attached thereto, upon payment of which sum and the indorsement

of the bill of lading the cotton was deliverable to them. The bill of lading was in the usual form, making each successive carrier responsible for his own fault only, and these words were noted in the routing specifications therein, "Railroad Compress, Birmingham, Ala." The plaintiffs paid the draft for $4,000. The bill of lading duly indorsed was turned over, and the cotton became deliverable to them. When the cotton arrived in Birmingham, it was transferred to the Belt Railroad and ,from the latter it was delivered to the compress company, three car loads on the 18th of March, 1903, and the remaining two car loads on the 19th of the same month. This is the last trace of the cotton. The compress company never delivered it to the Southern Railway Company, but the latter company was notified on March 27, 1903, by the agent of the Kansas City, Memphis & Birmingham Company of the delivery of the cotton to the compress company, and the receipt of the latter for the cotton bearing date March 26th, was handed to the Southern Railway Company at the same time, as was also the unearned freight money, which had been paid in advance. There was also evidence from which the jury might have found that the Southern Railway Company had received earlier notice from the Kansas City, Memphis & Birmingham Railroad Company that the cotton in. question had been delivered to the Belt Line Company, for account of the Southern Railway Company for compression, and forwarding by the latter to New York. But, however that may be, the Southern Railway Company made no complaint that the notification of March 27th was not seasonable.

On proof of these and some other facts to be noticed later on, the plaintiffs gave up the pursuit of the other railroad companies, and confined its suit to the Southern Railway Company, as to which the controversy turned ultimately upon the question whether the compress company was the agent of the Southern Railway Company for the purpose of receiving the cotton. To establish this the plaintiffs relied upon two lines of proof—First, a contract between the railway company and the compress company; and, second, evidence of the previous method of doing business by the Kansas City, Memphis & Birmingham Railroad Company and the Southern Railway Company in transferring freight of this kind at Birmingham by the former to the latter for further transportation. As we think the contractual relations between the railway company and the compress company are of prime importance in determining the liability of the former for the loss in question, it is expedient to set it forth (except some formal parts) as follows:

"Whereas, the compress company is now engaged in operating a cotton compress at Birmingham, in the state of Alabama; and, whereas, during the cotton season of 1902-1903 the railway company will accept uncompressed cotton for through transportation, but, for convenience in forwarding the same, desires that a portion thereof shall be compressed at said compress of the compress company; now, therefore, this agreement witnesseth: That the compress company, for and in consideration of the premises and the sums of money herein agreed to be paid by the railroad company, hereby covenants and agrees:

"(1) That, as and when requested by the railway company so to do, it will promptly receive and receipt for, unload from cars or wagons, shelter

when practicable, compress and load on cars in the order of its receipt, or as may be otherwise instructed by the railway company, all cotton of such dimensions as to make it practicable to compress it to a density, as herein below specified, intended for shipment over the line of the railway company and its connections, and tendered to the compress company for that purpose by the railway company or by shippers, and for such cotton as is so tendered by shippers it will issue to shippers tendering same one single certificate only, covering each lot of cotton designated by one mark. Where the cotton which the compress company is requested by the railway company to receive and handle as above stated is tendered to the compress company of dimensions such as to make it impracticable to compress such cotton to a density as great as 22½ pounds to the cubic foot, the compress company shall immediately notify the agent of the railway company of the tender of such cotton for such instructions as to disposition as the railway company may desire to give.

"(2) That it will well and sufficiently compress all cotton to it as hereinbefore provided, and will place upon each bale of cotton so compressed at least eight bands, so that the density of each bale of cotton so compressed shall not be less than 22½ pounds per cubic foot at the ports, as measured from end to end and over the bands; provided, that if cotton is delivered to the compress by the railway with less than six bands, the bands necessary to make the number of bands equal six shall be put on the bale at the expense of the railway.

"(3) That before loading any cotton compressed by it under the terms of this agreement, it will carefully and properly reband each bale so handled by it.

"(4) That it will load not less than 50 bales of compressed cotton in any standard car of 31 feet in length, excepting remnants, and when loading is completed will cause doors of cars to be closed, sealed, and stripped in proper manner (doors closing tight into the side of a car properly fastened and sealed need no strips), and thereafter will promptly furnish unto the railway company an accurate statement of all cotton loaded in each and every car.

"(5) That it will indemnify and save harmless the railway company against any and all claims, demands, suits, judgments, and sums of money accruing to any person against the railway company for loss or damage to cotton so tendered to, compressed by, or loaded by, the compress company, howsoever such loss or damage may result, except by fire, if the same accrues between the time of delivery of such cotton unto the compress company by shippers or by the railroad company, or the time when the railway company shall have placed cars of uncompressed cotton in position for unloading at the compress company, with way bills, abstracts, or other memoranda or advice, showing that the cars have been placed in position for such unloading and the time when the same have been loaded or reloaded in cars, and the railway company so notified that the cotton has been so loaded or reloaded, or until the railway company shall have been in default for 48 hours in furnishing cars therefor, as hereinafter provided, such indemnity to be effective at whatsoever time such loss or damage may be discovered; and to that end hereby specifically assumes all responsibility for the proper handling, storing, and protection of such cotton while in its possession, as hereinbefore provided, and agrees that the count made by the railway company or its connections of the number of bales of cotton loaded in any car under the seals of the compress company, at the points where such seals are broken, shall be final and conclusive as between the parties hereto for the purpose of this agreement as to number of bales of cotton loaded in such car, such count to be promptly and carefully made and checked.

"(6) That it will pay unto the railway company, upon weekly or monthly bills to be rendered by the railway, any and all sums disbursed by the railway for premiums of insurance against loss or damage by fire to any cotton covered by outstanding bills of lading of the railway, for the full value thereof, while such cotton may be in possession of or upon the premises of the compress company: Provided, however, that the rate of such premiums shall not exceed at any individual compress the average of premiums for the year, or for

146 F.—3

the cotton season, paid by the railway at said compress; and also in like manner, will reimburse the railway for any and all expenses incurred in putting in proper shipping condition cotton received at the port from the compress company, with heads open, bands off, or insufficient density, provided such expenses are incurred and bills rendered to the compress company, or it notified, within 60 days after the cotton has been unloaded at the port, and the payment of such expenses to be made by the compress company within 30 days after the bill of the railway therefor shall have been rendered to the compress company.

"(7) That the compress company shall not undertake, do, or perform, for any person, for less price than herein provided for, services substantially similar to those herein agreed to be performed for the railway company by means of the payment of any rebate, commission or drawback out of the charge of the compress company for compression as provided for herein; but if the compress company should, because of competition of other companies, or for other good reasons, undertake, do, or perform services substantially similar for a less price by other means than by rebate, commissions, or drawback, in that event the railway company shall have the benefit of any rate allowed to such person or persons.

"(8) That it will execute and deliver unto the railway company, simultaneously with the execution of this agreement, a good and sufficient bond in the penal sum of $10,000, with sureties to be approved by the railway company, conditioned upon its faithful performance of each and every one of its covenants in this agreement contained.

"And the railway company hereby covenants and agrees:

"(1) That it will pay unto the compress company, in weekly settlements, during the life of this agreement, such sums as may be determined by applying such reasonable charge not exceeding seven and one-half cents per 100 pounds; when destined to mill points in South Carolina, North Carolina, and Virginia; and when destined to South Atlantic ports, Gulf ports, Virginia ports, Baltimore, Philadelphia, New York, and Boston, proper and for export, interior eastern points, points in Canada, and points north of the Ohio river, eight and one-half cents per 100 pounds as ordinarily and contemporaneously paid by the railway company at other compresses, for similar services performed under substantially similar circumstances and conditions, to the bill of lading weights of the cotton of the railway company during the preceding calendar month: Provided, however, that when the railway company shall issue its bill of lading for compressed cotton to be delivered to it for shipment at the compress of the compress company, then the compress company shall look to the shipper of such cotton for its charges, and not to the railway company."

"(2) That it will furnish upon the tracks used by the compress company in loading cotton for account of the railway company, as and when required, and within reasonable time after notice of such requirement, such cars as may be necessary for the loading and shipment of such cotton as may be compressed for account of the railway company, and, in the event that the railway company shall fail to furnish such sufficient supply of cars within forty-eight hours after notice in writing of the requirement of the compress company therefor, then the railway company shall and will be responsible for all cotton actually delayed by its said default from and after the expiration of forty-eight hours from the service of such notice, in all respects as if the same had been actually delivered unto the railway company at the expiration of such forty-eight hours, but not otherwise."

The evidence tended to prove that in making delivery by the Kansas City, Memphis & Birmingham Company at Birmingham for further transportation by the Southern Railway, the custom had been sometimes to make direct delivery to the Southern Railway Company, without the intervention of any other parties; this when the cotton was not intended to be compressed at that place, and sometimes to deliver it to the Belt Railroad to be taken to the works of the compress com-

pany, by which it would be delivered to the Southern Railway Company after it had been compressed. This was the course pursued when for any reason the probable expectation would be that the cotton would be compressed, as, for instance, when the ultimate destination would be a distant point. In the latter case it was customary for the Kansas City, Memphis & Birmingham Company to notify the Southern Railway Company of the arrival and delivery of the freight to the compress company, and forward that company's receipt therefor. If, as was the case in this instance, the through freight had been paid in advance, the first-named company would deduct its own proportion, and turn over the balance to the Southern Railway Company. That was what was done here.

The cause was submitted to the jury under instructions from the court, some of which were excepted to. Certain requests for instructions were presented in behalf of the railway company, which were refused, and exceptions were taken to the refusal. A verdict was rendered in favor of the plaintiffs in the sum of $4,000, and the interest thereon, and judgment was entered accordingly.

The grounds on which a reversal is prayed are:

1. That there was no evidence to sustain the verdict.

2. That the court erred in denying a motion of the plaintiff in error for a peremptory instruction to the jury.

These may be disposed of together. From what has been said of the evidence, we think the court was required to submit to the jury the question of the agency of the compress company in receiving the cotton, if, indeed, the contract between that company and the railway company and the undisputed facts did not, of themselves, establish such agency. If the latter view were to be taken of the case, the court would have been required to have instructed for the plaintiff. We think it is not necessary to decide whether such action would have been proper, for there was other evidence from which the jury might have found that the employment of the compress company was for the purpose of facilitating the transportation by reducing the bulk of the cotton, and was an expedient whereby the railway company would more easily earn the stipulated freight than if it should transport it in its larger bulk. If it was done for the convenience of the railway company, or mainly for its convenience, it surely would not be unreasonable to find that during the time while the compress company had the possession it was holding it as an agent or employé of the railway company.

3. In the course of its instructions the court charged the jury as follows:

"I charge you that it would not be a delivery of this shipment of cotton to the Southern Railway Company if you believe the Kansas City, Memphis & Birmingham Railway Company delivered it to the Birmingham Belt Line R. R., and they in turn delivered it to the Railroad Compress, unless you should also find that the compress company was the agent of the Southern Railway Company, and authorized to receive cotton for the Southern Railway Company for shipment over that line; and in that case delivery to the compress company would be a delivery to the Southern Railway Company. If the cotton was lost or stolen while in the compress company's possession, the Southern Railway Company would be liable."

We think there was no error in this. It was sufficiently favorable to the plaintiff in error. It required as a condition to the plaintiff's recovery that the jury should find that the compress company was an agent and authorized to receive cotton for the railway company. It is urged that there was no evidence justifying this charge. But, for reasons already stated we think otherwise.

4. The court also instructed the jury as follows:

"If you believe from the proof that the Kansas City, Memphis & Birmingham Railroad Company and the Southern Railroad Company had an agreement or understanding that when cotton arrives in Birmingham over the road of the former company for the East that it was to be compressed at Birmingham, and that it would be a delivery to the Southern Railway Company when the Kansas City, Memphis & Birmingham Railroad Company delivered it to the Railroad Compress, or if there was no such express understanding, but you believe from the proof that business of this character had been conducted in this manner for such length of time and with such frequency as to amount to a custom, and, in the absence of any express agreement or understanding, both roads had so acted in such transactions as to lead the other to believe that cotton delivered at the Railroad Compress by the K. C., M. & B. R. R. to be compressed and forwarded over the Southern Railway would be considered a delivery and treated by both roads as a delivery to the Southern; and, if you believe the K. C., M. & B. Railroad in this case relied upon this custom so established, and delivered the cotton in question, believing at the time it would be a delivery to the Southern, and the Southern would so accept it, then the Southern Railway could not relieve itself from liability in this case if the cotton was lost or stolen while in the compress by insisting that the cotton was not delivered to it."

It is objected that "there was not a scintilla of evidence to justify this charge." The correctness of the conclusion as matter of law is not challenged, and we think the jury would have been justified in finding that the practice had been substantially that which the court made a condition to a verdict in favor of the plaintiffs. Of course, we are not to be understood that the evidence did prove such a custom. It was for the jury to draw conclusions of fact from the evidence.

5. Requests were presented for instructions in regard to the requisites of constructive delivery of the cotton by means of the transmission of way bills, expense accounts, and shipping instructions. These instructions were refused, and properly so, for they would have only tended to confuse the jury. It was clearly proved and is admitted that the cotton was actually delivered to the compress company on the 18th and 19th of March, 1903.

Another objection is that the court refused an instruction that, if the jury could not find any evidence from which to determine the quality and value of the cotton, they would not be justified in rendering a verdict for it. But the bill of lading stated the quantity, and witnesses testified to the current value, and there was no conflict on either subject. For the court to have given an instruction which would present these subjects to the jury as though they were matters of doubt would be diverting their minds into a region of supposed doubt where none in fact existed.

There is really only one important question in the case, which is

that of the relation of the compress company to the Southern Railway Company, and that has been determined against the latter. Its misfortune is in having put in its place a dishonest agent.

The judgment must be affirmed, with costs.