## CANADIAN PAC. RY. CO. v. WIELAND.

(Circuit Court of Appeals, Ninth Circuit. October 4, 1915. Rehearing Denied November 8, 1915.)

No. 2582.

1. CARRIERS ⊂⇒41—CARRIAGE OF GOODS—LIABILITY.

The agent of the defendant carrier notified a Swiss shipper that a vessel connecting with defendant's railroad would leave Antwerp on June 5th, and requested him to forward the shipment to arrive in that port not later than May 30th, which he did. The vessel not then being ready to receive the shipment, defendant's agent directed that the property should be stored in the government warehouse; the shipment being sent through Belgium in bond without payment of duty. Thereafter defendant's agent secured a permit for the removal of the goods, but they were destroyed in the government warehouse before removal. *Held*, that the goods had been delivered and accepted by defendant as a carrier for immediate transportation, and it was liable for their loss, this not being a case of where property is in the custody of law by reason of stoppage for inspection by customs officials; defendant's agent having power to have immediately loaded the property or to have paid the duty and kept it in his custody outside of the government warehouse.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 102–106; Dec. Dig. ⊂⇒41.]

2. CARRIERS ⊂⇒135—ACTIONS—LOSS OF FREIGHT—DAMAGES.

In an action brought against the carrier at the point of destination for the loss of goods destroyed after acceptance at the place of shipment, the measure of damages is properly the value of the goods at destination.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 557–559, 599–602, 603½–604½; Dec. Dig. ⊂⇒135.]

In Error to the District Court of the United States for the Second Division of the Northern District of California; Wm. C. Van Fleet, Judge.

Action by John Wieland, doing business under the firm name and style of Wieland Bros., against the Canadian Pacific Railway Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

The defendant in error brought an action to recover the value of goods delivered to the plaintiff in error for transportation from Antwerp, Belgium, to San Francisco, Cal. The goods were destroyed by fire while they were stored in the government warehouse at Antwerp, in the custody of the customs authorities of the kingdom of Belgium. A jury trial was waived, and the cause was tried before the court on an agreed statement of facts, the substance of which is the following:

The defendant is a corporation of the Dominion of Canada, having a place of business in San Francisco, and is a common carrier of goods for hire. It maintained an agency in the city of Antwerp, Belgium, in the sole charge of one Debenham, who for seven years had been its European continental traffic agent. It was his duty as such traffic agent to receive at Antwerp, Belgium, to the extent that such shipments could be received by any one at Antwerp, pursuant and subject to the provisions of the International Treaty hereinafter referred to, and the laws of the kingdom of Belgium, shipments of merchandise such as that here involved coming there in bond for export pursuant and subject to said treaty, intended to be transported by the defendant, and to give such directions to the government authorities at Antwerp as were

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

necessary to have such shipments of merchandise placed on board of steamers leaving Antwerp, and connecting with defendant's railroad at Montreal, Canada. But it was his duty to receive and forward such shipments and merchandise as aforesaid only to the extent and in the sense and in the manner according to which shipments of merchandise coming into the kingdom of Belgium in bond for export, pursuant and subject to the terms of the International Treaty might be received by any one at Antwerp, to be thence forwarded under and pursuant and subject to the provisions of said treaty. The defendant did not own the steamers upon which the shipments were embarked, but arranged with the owners of steamers for such space as was required from time to time to carry to Montreal such shipments as were ultimately intended to be carried towards their destination by the defendant's railroad. Such arrangements for ocean carriage of the shipments were contemplated by plaintiff and defendant in their dealings involved in this action. The plaintiff made arrangements from time to time with the defendant at San Francisco, by the terms of which, pursuant and subject to the terms of the treaty and the laws of the kingdom of Belgium, and not otherwise, Debenham, on behalf of the defendant, was to receive and cause to be embarked at Antwerp, pursuant to the arrangements aforesaid, all the shipments of merchandise consigned to defendant for carriage from Antwerp to San Francisco for an agreed rate of freight, and many shipments had been made under such arrangements prior to the shipment here in suit. In the regular course of business, and in pursuance of the terms of the arrangements aforesaid, shipments had been from time to time received by said Debenham for plaintiff, forwarded to San Francisco, and delivered to plaintiff, during the five years preceding the shipment here in question.

On May 11, 1901, Oswald Roth of Uster, Switzerland, shipper of the goods mentioned in the complaint, intending to send the same via Antwerp to plaintiff at San Francisco, by way of defendant's road from Montreal, wrote to Debenham as follows: "Messrs. Wieland Bros. at San Francisco have advised me that in future I must send my consignments by the last boat leaving Antwerp each month. Please let me know at once when the last sailing will take place this month." On May 13, 1901, Debenham answered as follows: "I request you to send me the lot of cheese for account of Wieland Bros. of San Francisco to Antwerp Bassins Transit Station, so that it will arrive on the 22d inst." On May 14, 1901, Roth answered: "I cannot get the shipment of 35 tubs ready to-morrow, and as Thursday is a holiday I cannot send it in time for the sailing on the 22d. Kindly let me know the date of sailing of the very next steamer following. * * * I counted on it sailing on about May 25th or 30th." On May 17, 1901, Debenham replied: "Please prepare the cheese so that it may arrive here towards the end of the month, for very probably there will be a sailing for Montreal by the end of the month, or on one of the first days of June. I shall have definite news to-morrow or day after, and meanwhile await my advices before shipping." On May 20, 1901, Debenham again wrote to Roth: "Confirming mine of the 17th inst., I take pleasure in advising you that the steamer Sardinian Prince will sail on June 5th, and I request you therefore to forward me the lot of cheese to Antwerp South Transit Station, to arrive not later than June 3d." On May 24, 1901, Debenham again wrote to Roth: "Please let me know by return mail if you will act on my letter of the 20th inst."

The International Treaty so referred to, binding upon various nations of Europe, including Switzerland, France, Germany, and Belgium, provided that shipments of merchandise intended for export beyond the territory of any of said nations could be transported through the territory of such nation "in bond"; that is to say, shipments of such merchandise could, pursuant and subject to the provisions of said treaty, be transported into and beyond the territory of such nations without payment of any duty, provided that each of the said shipments of merchandise were contained in receptacles that remained sealed, unbroken, and in the uninterrupted, exclusive, and official custody of the governmental customs authorities of the nations whose territory it was traversing throughout its transportation through such territory, and during its continuance in such territory, and until its final deportation there-

from. But persons standing in the relationship to such shipments of merchandise such as Debenham occupied to the shipment in controversy had the right to direct such governmental customs authorities when and where such shipments should be delivered for deportation. On May 25, 1901, the shipment of merchandise, consisting of 35 tubs of cheese which is involved in this action, and which was a shipment of merchandise intended to be forwarded pursuant and subject to the provisions of the arrangements aforesaid, and of the International Treaty above referred to, through territory belonging to the republic of Switzerland, the republic of France, the German empire and the kingdom of Belgium in bond for export from the port of Antwerp to San Francisco, there to be delivered to the plaintiff, was placed on board a local railroad train at Uster, Switzerland, consigned to the firm of Niebergall & Goth, forwarders in Basel, Switzerland; the waybill indicating that the shipment was sent in bond in transit to the United States by way of Basel and Antwerp. The car containing the shipment arrived in Basel on, May 28th, and the original car containing the shipment was forwarded by Niebergall & Goth on the same day by way of the Alsace-Lorraine Imperial Railroad, and the Belgian State Railroad to Debenham at Anver-Bassins Station, Antwerp; Debenham being, pursuant to the arrangements aforesaid, designated as the consignee of the shipment in the accompanying waybill covering the transit from Basel to Antwerp. When the merchandise arrived at Sterpenich, a station on the Belgian frontier, it was received by the Belgian State Railroad about 5 p. m. May 29th. From there it was carried by the latter railway to Anver-Bassins Station at Antwerp where it arrived May 30, 1901. The Belgian State Railway was operated by the government of the kingdom of Belgium, and the same officials of the government who operated the railroad were also customs officers of the government, acting as such with respect to the freight which was transported by said railroad, pursuant to the provisions of the treaty aforesaid. Upon the arrival of the car at Anver-Bassins Station, at Antwerp, as aforesaid, the station authorities notified Debenham of its arrival, and delivered to him the waybill which accompanied the shipment.

According to the provisions of the treaty and the laws of the kingdom of Belgium, Debenham then had the option of directing the railroad customs officials to take the goods to the Belgian governmental customs warehouse, called the Entrepôt Royal, there to remain until such time as he should direct them to be taken to the ship which was to receive them, or of directing said officials to take the car containing the goods to the wharf at which the ship was to receive them, there to remain until such time as he should direct the goods to be placed on board such ship. In either case the goods were required to remain, and would have remained during their entire transit, and their detention, whether in the Entrepôt Royal, or on the wharf, in the uninterrupted, exclusive, official custody of the government customs authorities until actually loaded on board the ship. As the ship, at the time of the arrival of the goods at Antwerp, was not ready to receive them, Debenham directed the railroad customs officials to take the goods to the Entrepôt Royal, there to be held in the custody of the Belgian customs authorities until he notified them that the vessel which was to receive the shipment was ready to receive and embark the same for export from Belgium, whereupon it would have been the duty of the Belgian customs authorities to transport the shipment from the Entrepôt Royal to the wharf and there deliver it physically to the ship which was to receive it, and to make certain that the shipment was actually embarked on the vessel and carried out of the kingdom of Belgium. Under the provisions of the said treaty and the laws of the kingdom of Belgium, a shipment of merchandise like the one aforesaid, passing through Belgian territory in bond in transit merely, was required to remain uninterruptedly in the exclusive official custody, possession, and control of the customs authorities of the kingdom of Belgium (subject to the direction of persons standing in a relationship to such shipments such as Debenham occupied to the shipment in controversy, as to when and where such shipments should be delivered for deportation, as aforesaid), until the shipment was actually physically delivered by such customs authorities at the instance of the consignee, on board the vessel which was to transport it beyond the kingdom, unless the consignee

paid to the Belgian government the charge and duties due on the shipment, and accepted actual physical delivery and possession thereof.

In pursuance of the directions of Debenham, the car which contained the goods involved in this controversy was taken by the customs authorities from the Anvers-Bassins Station to the Entrepôt Royal, where, on June 1, 1901, the goods were unloaded from the car and stored in the warehouse, under the exclusive custody and control of the Belgian customs authorities. Those authorities then delivered to Debenham a document called "Acquit de Transit," which Debenham was to keep until the moment when the goods were to be removed from the warehouse to the steamer, and was to deliver up the same to the customs authorities whenever, on his directions, the goods were to be embarked on board of the deporting vessel. Whenever the goods were thus to be removed, the law required that Debenham should present this "Acquit de Transit" to the customs authorities, whereupon the latter would issue a "Remise au Depart," and send the goods to the deporting steamer; the officers of the customs remaining in custody thereof until the goods were actually and eventually loaded on board, and thereby passed out of the kingdom. The warehouse charges were paid by Debenham. The transportation charges from the warehouse to the steamer would have been payable by him, and chargeable to and collectible from Roth, the shipper. Debenham did secure a "Remise au Depart" for the goods before they were destroyed in the bonded warehouse. Debenham, as agent of the defendant, advertised in the Lloyd Anversois, an Antwerp daily newspaper, on May 22, 1901, that the steamer Sardinian Prince would be able to load for Montreal direct, and would sail on June 5, 1901. That steamer entered the port of Antwerp at noon, Saturday, June 1, 1901, in ballast, and was berthed, and began to load her cargo on Monday, June 3d, finished loading June 7th, during the night, and left the port on June 8th. On June 5, 1901, at 2:36 p. m., fire broke out in the Entrepôt Royal, which destroyed the building and contents, including the goods here in suit. The fire was not due to any fault or negligence of the defendant. The market value of the cheese at the time and place where it was destroyed was the sum of 16,569.40 francs, and its value at San Francisco on August 1, 1901, the day when, in due course, it would have arrived there, had it been shipped on the Sardinian Prince, was the sum of $6,200.

Upon the pleadings and the agreed statement of facts, the court below ordered that judgment be entered in favor of the plaintiff and against the defendant in the sum of $6,200, together with interest at 7 per cent. per annum from August 1, 1901, to December 14, 1914.

Curtis H. Lindley, Henry Eickhoff, and Emil Pohli, all of San Francisco, Cal., for plaintiff in error.

Louis T. Hengstler and Golden W. Bell, both of San Francisco, Cal., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and RUDKIN, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). [1] It is the contention of the plaintiff that the goods before the time of their destruction had been delivered and accepted by the defendant, as a carrier, for immediate transportation, that the fact that the goods were destroyed while in the government warehouse, in the exclusive custody of the Belgian customs officials, in no way limits or varies or changes the responsibility of the defendant, and that it is liable for the goods as an insurer thereof. It is the contention of the defendant that the goods were never at any time before their destruction in its possession, custody, and control, but that, on the contrary, being in the exclusive custody of the Belgian customs officials in the government warehouse of the kingdom of Belgium, they were in custodia

226 F.—43

legis, and, being there destroyed without fault on the part of the defendant, it is relieved from liability for their loss as an insurer.

In support of its contention that the goods were not delivered to the defendant, it cites St. Louis, etc., Ry. Co. v. Commercial Union Ins. Co., 139 U. S. 223, 11 Sup. Ct. 554, 35 L. Ed. 154. In that case cotton had been destroyed by fire while in the possession of a compress company. The railway company had never given any bill of lading for it. The cotton had been insured by the owners against loss by fire, and when the cotton was destroyed the insurance companies paid the losses and claimed that the railway company was liable under the contract which that company had made with the compress company to receive the cotton and transport it over its railroad across the Arkansas river to the press of the compress company, a distance of a mile and a half. The insurance companies contended that, by the failure of the railway company under its contract with the compress company to transport this cotton as fast as it came in, the amount of the cotton became so great as to constitute a public nuisance, as it was piled up in the compress company's warehouse, and overflowed into the adjoining streets. The court held that, as the railroad company had issued no bills of lading for the cotton which was destroyed, its failure to furnish sufficient transportation for the cotton to the compress company created no liability in contract or tort to the owners or insurers of the cotton or to any other person. The court said:

"This cotton, certainly, was in the exclusive possession and control of the compress company. The railway company had not assumed the liability of a common carrier, or even of a warehouseman, with regard to it, had given no bills of lading for it, had no custody or control of it, and no possession of it, actual or constructive, and had no hand in placing or keeping it there."

The important distinction between that case and the case at bar is that in the latter case the defendant had, so far as it lawfully could, received the goods in transit and had assumed the direction of their disposition, and by its own act had placed the goods in the warehouse in which they were destroyed.

A case more directly in point is Arthur v. Texas & Pacific Ry. Co., 204 U. S. 505, 27 Sup. Ct. 338, 51 L. Ed. 590, in which it was held that where a railway company has no other place for delivery of cotton than the stores and platform of a compress company; where all cotton transported by it is compressed at its expense and by its order, its acceptance of and exchange of its own bills of lading for receipts of the compress company passes to it the constructive possession and absolute control of the cotton represented thereby, and constitutes a complete delivery thereof to it, and that the railroad company could not thereafter divest itself of responsibility for due care by leaving the cotton in the hands of the compress company, as that company became its agent.

Another case in point against the defendant's contention is Southern Railway Co. v. Hubbard Bros. Co., 146 Fed. 31, 76 C. C. A. 489. In that case the defendant, a railroad company, made a contract with a cotton compress company which recited that the railroad company would receive uncompressed cotton for shipment, but for its own con-

venience desired to have a portion of the same compressed, and provided that the compress company would receive and receipt for such cotton from the railroad company, or the shippers, compress the same, and load it in cars of the railroad company as directed, and that it should be responsible to the railroad company for any loss or damage to such cotton while in its possession. A through shipment of cotton was made from a point in Mississippi to the plaintiff at New York, by way of Birmingham, and thence over the defendant's railroad. The initial carrier delivered the cotton to the Belt Line road, which delivered it to the compress company, and then paid to defendant its share of the freight and delivered to it the compress company's receipts. The cotton was not delivered by the compress company to the defendant, and was never received by the plaintiff. There was evidence of a custom of the initial carrier to make deliveries of cotton to the defendant at Birmingham in the manner which was pursued in this instance. It was held that the evidence warranted the submission to the jury of the question whether the delivery of the cotton to the compress company constituted delivery to the defendant, either because of agency to receive it, created by the contract, or because of the evidence tending to prove a custom.

Upon the agreed statement of the facts it appears that it was the duty of Debenham, the defendant's agent, to receive at Antwerp shipments of merchandise coming there in bond for export and intended to be transported by the defendant, and to cause the same to be there embarked. It was not his duty to receive goods for warehousing or storage. If goods were warehoused, it was only for the defendant's own convenience, and for the reason that it had no available ship ready to receive the goods. The warehouse charges were paid by Debenham as agent for the defendant, and were not charged either to the shipper or the purchaser. The correspondence between Debenham and the shipper in this instance shows that they both had in contemplation a shipment for immediate carriage, and that it was Debenham's purpose to have the shipment timed with reference to the sailing day of the steamer. The waybill recited that the shipment was in bond "in transit to the United States." The whole correspondence shows that the relation of the defendant to the shipment was that of a common carrier only. It is evident that the goods would not have been warehoused, but for the fact that the ship was not ready to receive them. When the goods arrived at Antwerp, and Debenham received the way-bill, he had the right to cause them to be placed at once on board a ship or on the wharf for loading, or to have them placed in the custom's warehouse, and he had the further alternative of paying the duty and relieving them from bond. The shipper had wholly parted with his control of the goods, and had placed them in the care and control of the defendant's agent at Antwerp, subject only to the paramount authority of the customs officials, so long as the goods remained at that place in bond, and until they were loaded on the ship. On June 1, 1901, Debenham caused the goods to be deposited in the customs warehouse, and received an acquit de transit. At noon of the same day the ship arrived. Two days later she began to load. Two days after she began loading the goods were destroyed by fire, but before

that time Debenham had surrendered the acquit de transit, and had paid the warehouse charges, and had received a remise au depart, authorizing him to take the goods from the warehouse. Upon those facts we think that the goods had been delivered to the defendant and accepted by it for carriage, and that its liability as a common carrier had commenced.

We think it clear that at the time when the goods were destroyed they were not in custodia legis. The defendant was not obliged to place them in the warehouse. It could have so arranged its business as to make the warehousing unnecessary. It placed the goods in the warehouse purely for its own convenience, and it had the right at any time to take them from the warehouse to the wharf for loading, upon the payment of the warehouse charges, charges which it had incurred for its own convenience, and which it was under obligation to defray at its own expense. The defendant quotes from section 4 of Hutchinson on Carriers:

"If, for example, the private carrier or any other ordinary bailee be robbed of the goods, or if they should be accidentally destroyed by fire or any other calamity, without negligence on his part, the law will excuse him; but if they be taken from a common carrier by force ever so irresistible, less than the public enemy, or if they should be destroyed by fire ever so unavoidable, he will nevertheless be liable for them. He is an insurer of the goods against all losses except those caused by the act of God, the public enemy, the law, the owner, or the inherent nature of the goods."

But "the law" so enumerated in the exceptions does not comprehend that class of authority which was exercised by the Belgian government, under its treaty, with reference to these goods, for, as we have seen, the defendant was under no obligation to place the goods in the customs warehouse. The custody of the goods by the customs officials of Belgium was a qualified possession, and was solely for the purpose of complying with the International Treaty and securing the observance of customs regulations while the goods were in bond en route to a foreign country. That custody was not inconsistent with a concurrent possession by the defendant. It was not a greater or different custody while the goods were in the customs warehouse than it was while they were on the train in care of train officials before the defendant received them.

"When property is lawfully taken, by virtue of legal process, it is in the custody of the law, and not otherwise." Gilman v. Williams, 7 Wis. 329, 76 Am. Dec. 219.

The defendant in this connection cites Hutchinson on Carriers (3d Ed.) § 755, as follows:

"The parties to the contract of carriage must be presumed to have contracted with the common knowledge of the necessity for customs detention and inspection, and the burden is on the shipper to make provision for the passage of his property beyond the borders of the foreign territory, if nondutiable. The carrier is wholly powerless to prevent its seizure and detention and he cannot be held liable for its destruction, either in transit or at the place of destination, while in the possession of customs officials, by a fire which he did not occasion, and which he could not, by any possible act of diligence, have prevented."

What was meant by the text-writer as to the carrier's liability for the destruction of goods in transit while in the possession of customs officials is rendered certain by the authorities which are cited to sustain it. These are Parker v. Steamship Co., 74 App. Div. 16, 76 N. Y. Supp. 806, and Howell v. Railway Co., 92 Hun, 423, 36 N. Y. Supp. 544. In the first of those cases the plaintiff arrived at Bremen from New York on the defendant's steamer. His trunks were in the baggage room of the steamer. He desired to have them forwarded by slow freight to a town in England, and the defendant agreed to forward them in that way to the designated address. On their arrival in England they were detained in the customhouse and were there destroyed by fire. The court held that the defendant was not liable for the loss, that the transportation of the trunks by the defendant had ended on their arrival at Bremen, and that the defendant's contract to forward the trunks to England was not the contract of a common carrier, but only a contract to forward, and that it involved no common carrier's responsibility. In Howell v. Grand Trunk Ry., the plaintiff purchased a ticket from the defendant railway to go to a designated point, and obtained leave to stop over for a day at an intermediate station. He requested that his baggage be unloaded there; but this was not assented to, and it was carried through to the original point of destination. There it was taken in charge by the United States customs officers, and there it remained until destroyed by fire. It was held that the defendant was not liable for the loss. The court said:

"The property was not in the possession or under the control of the defendant at the time of the loss; nor was it in any sense the fault of the defendant that it was not so."

The distinction between those cases and the case at bar is very clear. In the cases cited the defendants had fully complied with their contracts to carry the plaintiff's baggage to a designated point. In the second case cited that point was Suspension Bridge, on the border line between the United States and the Dominion of Canada. There the baggage was unloaded, and it was taken into the possession of the customs officers of the United States. With that act the defendant had nothing to do. It fully carried out its contract in hauling the baggage to Suspension Bridge. The baggage was not delivered to the customs authorities for the convenience of the defendant, and from the time when the baggage arrived at Suspension Bridge the defendant had no further right of control over it.

The defendant suggests that the controversy involved herein presents in some respects questions which are wholly new. Conceding that to be the case, we are called upon to apply to its determination the settled principles of the law. The shipper of the goods had parted with the possession thereof under a contract which provided for their continuous carriage to their point of destination. He had the right to rely upon the carrier's liability as an insurer. He had no notice that at any point en route that that liability would be suspended. He had no notice of a suspension of that liability, and no opportunity to insure against loss during such suspension. But there was no suspension of liability. The defendant, through its agent, received the waybill of

the goods, and the authority to control their disposition. For the defendant's convenience he elected to store them in the customs warehouse. If the goods had been destroyed while en route to Antwerp, there could be no question but that the carrier in whose possession they were would have been responsible for their loss. We think it clear that the defendant, which received the goods at Antwerp, is responsible for their loss while in the customs warehouse, for the custody and control of the customs officials over the goods was the same while they were in transit by rail through Belgium that it was after their arrival at Antwerp and while stored in the customs warehouse.

[2] It is contended that the court below erred in ruling that the measure of damages was the value of the goods at their destination, and not their value at the place of their destruction. The defendant admits the general rule, as expressed in section 1360, Hutchinson, Carriers, that:

> The measure of damages "is generally the value of the goods at the destination to which he [the carrier] undertook to carry them, with interest on such value from the time when the goods should have been delivered, deducting, however, the unpaid cost of transportation."

But the defendant invokes the exception to the rule as expressed in Moore on Carriers, page 401, in which it is said:

> "And where the contract so provides, or where the special circumstances so require, the market value at the place of shipment may be taken instead of that at the place of destination."

To support this exception the text-writer cites Lakeman v. Grinnell, 5 Bosw. (N. Y.) 625, and Wheelwright v. Beers, 2 Hall (N. Y.) 391, where a voyage was broken up at an intermediate port, and it was held that the measure of damages was the difference between the prime cost of the cargo and what it was sold for after the voyage was broken up, and Dusar v. Murgatroyd, 1 Wash. C. C. 13, Fed. Cas. No. 4,199. In the Lakeman Case goods were consigned to Liverpool, and were burned on board the ship before leaving the port at New York. The court, in adopting the value of the goods in New York as the measure of damages, was influenced, as it appears from the opinion, by the consideration that the goods could be immediately replaced at New York and sent forward by another vessel, and that it would be unreasonable to give the plaintiff the profits which he might have made if the goods had not perished. The court said a case could well be imagined in which goods were lost in a port of departure, in which, from an impossibility of procuring other articles of the same kind, or from other causes, the value at the port of destination would furnish the only adequate indemnity to the plaintiff, and admitted the general rule that, when the vessel has arrived at the port of destination without the goods, the value of the missing goods at that place is adopted; but it based the decision as to the measure of damages upon the fact that the ship itself was lost before leaving the port of shipment, for Slosson, J., in his opinion said:

> "There is no question on the authorities but that the common carrier, who has received goods for transportation and has actually performed the journey or voyage, is, in case of nondelivery of the goods, unless the failure to

deliver is excused by the act of God or perils of the sea, liable, as a general rule, for the value or price which they would have brought at the port or place of destination, if they had been delivered according to the contract."

In Dusar v. Murgatroyd, it was held that, where goods were destroyed on board a vessel in the port where they are shipped, damages must be ascertained by the difference between the prime cost and charges and the sales at the port of shipment, and not by the probable profits if the goods had gone safely to the port of destination. The distinguishing feature in that case, or the "special circumstances" which may have been held to justify an exception to the general rule, was that the action was brought at the port of shipment by the consignor, who owned the goods, which were being shipped for sale at a foreign port. In such a case reason might be found for saying that the measure of damages would be the sum for which like goods could be bought in the market at the port of shipment. But in the case at bar the action is brought at the port of destination by the consignee, the purchaser of the goods, and we discover in the case no special circumstances requiring a deviation from the general rule. Hutchinson, Carriers, § 1361, says of the rule:

"Its justice is apparent, when the owner of the goods himself is to take them at their destination, there to use or to sell them on his own account."

That rule was adopted by this court in Northern Commercial Co. v. Lindblom, 162 Fed. 250, 89 C. C. A. 230. See, also, The Nith (D. C.) 36 Fed. 86, 96; The Arctic Bird (D. C.) 109 Fed. 167, 175; The Joshua Barker, 1 Abb. Adm. 215, Fed. Cas. No. 7,547; The Boston, 1 Lowell, 464, 469, Fed. Cas. No. 1,671.

We find no error. The judgment is affirmed.