## McLEOD LUMBER CO. v. CROWLEY et al.

(District Court, N. D. California, S. D. October 26, 1925.)

No. 17836.

1. **Shipping ⬅106—Respondents in libel in personam for loss of rafts of piling held not estopped to deny delivery to them.**

Verified statement, signed by master of vessel, admitting delivery to vessel for loading of rafts of piling, which were subsequently lost, signed under belief that it was to enable shipper to collect insurance, and not as master's protest, *held* not to estop respondents in libel in personam from asserting that no delivery had in fact been made to vessel.

2. **Shipping ⬅105—Carrier liable for loss of or damage to cargo which has been delivered for transportation, though not moving in transit.**

To charge common carrier with liability it is not necessary that loss or damage shall have been of or to cargo physically moving in transit, but only that goods shall have been delivered to and accepted for transportation.

3. **Shipping ⬅105—Rafts of piling delivered alongside vessel held "delivered for transportation," so that liability of carrier for loss attached.**

Rafts of piling delivered alongside vessel and partially loaded *held* delivered "for transportation," so that liability of carrier for their loss attached, notwithstanding shipper reserved right to cull out and have thrown back into water poles found to be undesirable after loading.

4. **Shipping ⬅105—Raft of piling, tied to pier adjacent to vessel in readiness to be moved alongside, held not "delivered for transportation."**

Raft of piling, tied to adjacent dock, unconnected with that at which vessel was lying, in readiness to be moved alongside when other rafts tied alongside were loaded, *held* not "delivered for transportation" to vessel, so as to render it liable for loss of raft.

In Admiralty. Libel in personam by the McLeod Lumber Company against Thomas Crowley and another. Decree in part for libelant; in part for respondents.

Bell & Simmons and Wm. S. Andrews, all of San Francisco, Cal., for libelant.

Farnham P. Griffiths and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for respondents.

KERRIGAN, District Judge. This is a libel in personam to recover for respondents' breach of a contract to carry piling, which it is claimed was delivered to their steamer Santa Inez at Coos Bay, Or., for transportation to San Pedro, Cal., in 1922.

It appears that the libelant brought to and moored alongside the vessel two rafts of poles, and delivered them to it for shipment, under a contract of carriage which had been effected by correspondence. A third raft was tied up at an adjacent dock, which was unconnected with that at which the Santa Inez was lying, and separated from it by a 50-foot slip. The bow of the vessel was approximately 250 feet from the end of her dock, and hence about 300 feet away from the point at which this raft was tied. Respondents owned neither dock, and had no representatives present other than the ship's officers. To get to the third raft, it would have been necessary for the latter to have walked almost a quarter of a mile.

At some time between 5:30 and 6 p. m. on the day in question, this raft broke away from its fastening, and was carried down by a strong ebb tide against the unloaded portions of the other rafts. The resultant collision caused a number of their poles to go adrift, and these, together with part, if not all, of those in the third raft, were lost.

No receipt was given for any poles until they had been loaded on board the vessel. Both her mates testified that the officers did not know whether or not those in the third raft were intended to be shipped on board her. Both of them also testified that none of the officers or crew had anything whatever to do with tying the third raft up, and that none of the officers knew when it was done.

The custom was for shippers of poles to select, from those actually loaded on board, such of them as they regarded as culls, and unfit for shipment, and to throw them back into the water. Upon this fact respondents base their argument that there was no delivery for transportation of the first two rafts, insisting that, until such a delivery had been made, the carrier's liability could not attach. As for the third raft, they deny ever having received it in any way, and for this additional reason deny their responsibility for its loss.

Libelant has placed considerable reliance upon a verified statement, which was signed by the master two days after the poles were

lost. It contained admissions "that on the 21st day of September one Edgar Hannon delivered three rafts of TT piling to said vessel for loading as aforesaid; that said rafts were duly and properly secured in the usual and ordinary and customary manner; that during the night of September 21, 1922, in some way to your affiant unknown, these aforesaid rafts broke loose, and two of said rafts, containing 365 pieces of piling, were lost, and presumably were taken out to sea by the tide."

Some of the allegations set out were controverted at the trial. The captain testified that before signing this statement, which was presented to him for the ostensible purpose of enabling the shipper to collect insurance, he repeatedly refused to do so, on the grounds that the vessel had nothing to do with any of the poles, and that they had not been accepted on board. He denied that the statement ever had been intended to operate as a master's protest, and said that on the request of one of libelant's representatives he had signed "as a witness" to the loss.

[1] I think the statement, though verified, merits little weight. It was, as libelant insists, made almost contemporaneously with the occurrence of the facts in issue. But the circumstances under which it was signed, not only negative the inference that it was made on behalf of respondents, but show that its maker paid little attention to its contents. That it was not prepared by the captain is evident from a glance. The case, therefore, must be decided upon the proof adduced at the trial, unless respondents are estopped by this affidavit, which I do not think warranted, because of the knowledge of its agent of the circumstances referred to.

[2, 3] In order to charge a common carrier with liability, it is not necessary that the loss or damage shall have been of or to cargo physically moving in transit. As is stated in Hutchinson on Carriers, § 113: "The liability * * * commences whenever and as soon as the goods have been delivered to and accepted by him solely for transportation. * * * " If the poles in the first two rafts had been delivered upon the dock beside the vessel, under the control of her officers, and subject to being loaded at their convenience, clearly they would have been delivered "for transportation." The fact that they were left in the water can make no difference. On the contrary, their loading was facilitated by a delivery there, rather than upon the dock, and, since they

were "deposited for the purpose of being carried without further orders," respondents' liability as carriers "began with the receipt of the goods." 1 Moore on Carriers (2d Ed.) 170; Canadian Pacific Railway Co. v. Wieland (C. C. A. 9) 226 F. 670, 675, 676, 141 C. C. A. 426.

As for the argument that because libelant, even after loading, had a right to cull the poles, no delivery for transportation was effected prior to the exercise of that right, I am inclined to take the view that culling was not a condition precedent, but a condition subsequent, to such a delivery; in effect, a stoppage in transit. Assuredly, had the right to cull not been exercised, the vessel would have transported all the poles on board "without further orders" (1 Moore on Carriers, supra), and libelant would have been responsible for the freight on all of them.

[4] There is no evidence in the record to justify a finding that libelant's own fault caused the third raft to go adrift. I therefore hold that it is entitled to recover for all poles lost which were contained in the rafts tied next to the ship. But of the third raft itself I think no delivery for transportation has been made out.

The record shows only denials that the officers knew or had anything to do with it. Libelant's only witness testified that, "when piling or a pile raft came alongside," he considered that the vessel was responsible for its care. Furthermore, it has not been suggested how the master would have brought alongside a raft containing upwards of 200 large poles. For that purpose the services of one or more tugboats would have been necessary, and it was not shown that it was the custom of vessels carrying poles either to arrange for or to pay for such service. The reason why the third raft was tied to the dock appears to have been that its owners wished to have it available for loading when the loading of the other two rafts had been completed, and thus to avoid the payment of demurrage for delaying the vessel. None of these facts are consistent with a completed delivery for transportation, and all of them indicate that something remained yet to be done before it could be made. In a total absence of evidence to the contrary, I must assume that it was to be done by the libelant.

Let a decree, with interest and costs, be entered as to the logs in the first two rafts. The matter is referred to Commissioner Krull for the usual action and recommendations.