## PALMER et al. v. AGWILINES, Inc.
### No. 15729.

District Court, E. D. New York.
Sept. 22, 1941.

---

Bailey & Muller, of New York City (Gerald J. McKernan and Julius F. Steinbrenner, both of New York City, of counsel), for libelants.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and J. Franklin Fort, both of New York City, of counsel), for respondent.

CAMPBELL, District Judge.

This is a suit by the libellants to recover from the respondent for the damages sustained by a cargo of small arms ammunition while laden on board covered barge New Haven No. 122, when it became submerged, while tied between two barges on the south side of Pier 36, North River. Libellants, as carrier, have paid the shipper, Winchester Repeating Arms Company, for the damage to the cargo, and seek reimbursement of the amount paid, claiming that at the time of the damage, the cargo of small arms ammunition had been delivered by libellants to respondent for on-carriage as a connecting common carrier. Libellants contend in addition, and in the alternative, that respondent was bailee of the cargo on board lighter New Haven No. 122, and negligently and carelessly permitted the cargo to become damaged while in its possession.

On October 31st, 1938, at New Haven, Connecticut, Winchester Repeating Arms Company delivered to the libellants, in good order and condition, 575 cases of small arms ammunition, consigned to M. N. McLaren Company, Tampa, Florida, to be carried by the libellants to New York City, and by the respondent from New York City to destination on board steamship sailing from respondent's piers in this port, on or about November 3rd, 1938. A through bill of lading was issued by libellants.

The said ammunition was carried by the libellants in good order and condition, and

safely to New York City; and, on or about November 1st, 1938, this ammunition, together with a car of ammunition belonging to the Remington Arms Corp., was placed on board the covered barge New Haven No. 122, which was owned by libellants.

On November 2nd, 1938, the lighter New Haven No. 122, with the two carloads of small ammunition on board, the car of Remington Arms Corp. ammunition, being loaded on deck in the house forward of amidships, and the car of Winchester Repeating Arms Company being loaded on deck in the house aft of amidships, was brought to the north side of Pier 34 by the tug Transfer No. 19, and made fast at approximately 11:30 A. M., about two-thirds of the way out from the bulkhead.

Upon arrival, Charles S. Birs, the Captain of the New Haven No. 122, delivered to respondent's receiving clerk, on Pier 34, transfer papers covering the car of Remington Arms Corp. ammunition. He also handed to respondent's receiving clerk on Pier 36, three copies of certain transfer papers covering the car of the said Winchester Repeating Arms Company small ammunition, consigned to Tampa, Florida, and subsequently damaged.

During the afternoon of November 2nd, 1938, the carload of Remington Arms Corp. ammunition was unloaded by respondent's stevedores, the unloading being completed about 5:50 P. M., and the Captain of the No. 122, having been told by respondent's pier superintendent that he was not going to take the remaining cargo off that night, left for home between 5:50 and 6 o'clock P. M.

At about 6 o'clock P. M. the respondent's tug President shifted No. 122 and Erie barge No. 333 (which had been made fast outside the No. 122 about 3 P. M. on November 2nd, 1938), across the slip from the north side of Pier 34 to the south side of Pier 36, making them fast outside of barge Belton, the No. 122 being the center barge of the three after the manoeuvre.

The employees of the respondent working on Pier 36 left for the day around 6 o'clock P. M.

During the night of November 2nd, or the morning of November 3rd (the time never having been determined), the lighter New Haven No. 122 commenced to take in water, which was first discovered around 2:35 A. M., November 3rd, by Captain Pascale of the Erie tug Chicago, when she came into the slip to remove Erie barge No. 333 tied up outside the No. 122. The deck-

hand of the Chicago advised the pier watchman of the barge's condition, and the watchman advised Dunne, the roundsman, who immediately telephoned the New Haven Lighterage Department advising them that the barge was sinking.

On the morning of November 3rd, at about 7 o'clock A. M., Captain Birs of the New Haven No. 122 returned to Pier 36, and found his barge in a sinking condition. He telephoned the New Haven Railroad to advise them of this fact, and they told him they knew all about it. During the course of the morning various unsuccessful steps were taken, by libellants, preparatory to removing the cargo from the No. 122. At the request of Captain Birs slings were furnished by respondent to be strung under the No. 122 as it lay between the No. 333 and the Belton. Stevedores, and the Marine Superintendent of the New Haven Railroad, came to Pier 36 to undertake the removal of the cargo, and respondent chartered its lighter Belton to the libellants, so that the cargo on the No. 122 might be unloaded onto it.

The Merrit Chapman's derrick, Century, arrived at 3:15 o'clock P. M., put a sling under the No. 122, raised her and pumped her out, at which time a piece of wood was discovered to have pierced the No. 122 between the second and third planks above the bilge log, port side forward. The hole was patched, and the barge towed to drydock where a survey was held on November 4th, 1938. A survey had also been held on November 3rd, 1938, at Pier 36, while the No. 122 was submerged. The respondent was not given notice of either survey, and did not attend thereon.

A Uniform Straight Bill of Lading on the Winchester Repeating Arms Company form covering the damaged shipment was issued by libellants at New Haven.

As a result of the sinking and submerging of the barge No. 122 the Winchester Repeating Arms Company shipment was damaged, and a claim for damage was filed with the libellants, the initial carriers, under the through bill of lading, in the amount of $6,606.21 by the then owner, the shipper Winchester Repeating Arms Company. The libellants, the initial carriers, paid the said claim, and received an assignment thereof from the Winchester Repeating Arms Company.

■ This shipment having been made under Uniform Straight Bill of Lading for transportation of property from a point

in one State to a point in another State the libellants, as initial carriers, were under statutory obligation to pay for any actionable loss, or injury, occurring during the shipment, whether on its own line or on that of any connecting carrier. Interstate Commerce Act, Title 49, Section 20, subdivision (11) U.S.C.A.

So much of that section, as is necessary for consideration at this time, reads as follows: "Any common carrier, railroad, * * * receiving property for transportation from a point in one State * * * to a point in another State, * * * shall be liable to the lawful holder [of a bill of lading] for any loss, damage, or injury to such property caused by it or by any common carrier * * * to which such property may be delivered."

The libellants, as initial carriers, having paid the loss are entitled to recover the same from respondent, if the shipment had been delivered to it in good order. Interstate Commerce Act, Title 49, Section 20, subdivision (12), U.S.C.A. as amended March 4th, 1927.

That subdivision provides as follows: "The common carrier, railroad, or transportation company issuing such receipt or bill of lading, or delivering such property so received and transported, shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained, the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

■ As construed by the courts the words "required to pay" as used in said section do not require as a condition precedent to recovery against the connecting carrier that a judgment shall have been recovered against the initial carriers by the shipper. St. Louis & S. F. R. Co. v. First Nat. Bank, 68 Okl. 68, 171 P. 467; Kansas City & M. Ry. Co. v. New York Cent. & H. R. R. Co., 110 Ark. 612, 163 S.W. 171.

In the latter case, at page 174 of 163 S. W., the court said: "The receipt mentioned, in the absence of actual fraud, or such gross negligence on the part of the initial carrier in making the settlement with the shipper as would constitute a legal fraud, would be sufficient evidence to justify a recovery by the initial carrier against the connecting carrier of the amount as shown by the receipt * * *. But if there is a loss of goods under a contract of affreightment made with the initial carrier, which it in good faith has paid to the owner, it needs no other evidence to establish the amount of such claim against the carrier causing the loss than the amount specified in the receipt which it holds from the owner of the lost goods. * * * The amount of the receipt establishes the amount of the claim of the initial carrier, and, in the absence of fraud as explained, is conclusive thereof."

■ The general rule as between connecting carriers at common law is that the one which has been compelled to pay for a loss or injury for which another is primarily liable is entitled to exoneration at the hands of the latter. Powhatan Steamboat Co. v. Appomattox Railroad Co., 24 How. 247, 65 U.S. 247, 16 L.Ed. 682; Conkey v. Milwaukee & St. Paul Railway Company, 31 Wis. 619, 11 Am.Rep. 630.

The good faith of the libellants in making the payment to the Winchester Repeating Arms Company has not been disputed, and there has been no charge made of fraud or gross negligence in making such payment, nor has it been criticised, therefore, if the cargo was in the control or custody of the respondent at the time the loss occurred, then, under the Interstate Commerce Act, the libellants are entitled to a recovery from respondent.

The Interstate Commerce Act, Title 49, Section 3 (3), U.S.C.A., provides that connecting carriers "shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, * * *."

■ Piers 34 and 36 (there being no Pier 35), controlled by respondent, constituted the place and means used for such interchange. It was there, and at no other place, float or pier, that libellants were required to tender the traffic. New York Central R. Co. v. Long Island R. Co. (The Talisman), 288 U.S. 239, 53 S.Ct. 328, 77 L. Ed. 721; Baltimore & O. R. Co. v. Long Island R. Co., 126 Misc. 474, 213 N.Y.S. 329, 332.

■ The libellants did as they were bound to do under the through bill of lading, tender, the two ammunition shipments on one lighter, to respondent for "on-carriage" at said Pier 34, and the bargee of that lighter did deliver the shipping documents for said cargoes to respondent's receiving clerks.

On behalf of the libellants it is contended that this constituted a delivery of the cargo in question to the respondent, and that from then on the lighter and cargo were in the control and custody of the respondent, and cites ·Galveston Wharf Co. et al. v. Galveston, Harrisburg & San Antonio Railway Co. et al., 285 U.S. 127, 52 S.Ct. 342, 76 L. Ed. 659; Washburn-Crosby Co. v. Boston & A. R. R., 180 Mass. 252, 62 N.E. 590; Aetna Insurance Co. v. Wheeler et al., 49 N.Y. 616; Converse v. Norwich & New York Transportation Co., 33 Conn. 166; McMillan v. Chicago, R. I. & P. Ry. Co., 147 Iowa 596, 124 N.W. 1069; Pratt v. Grand Trunk Railway Co., 95 U.S. 43, 24 L.Ed. 336; Jennings v. Missouri Pac. R. Co., 172 La. 522, 134 So. 694, 696; Canadian Pac. Ry. Co. v. Wieland, 9 Cir., 226 F. 670, 675; Campbell et. al. v. The Sunlight, Fed.Cas.No. 2,368, 2 Hughes 9; Pollard v. Vinton, 105 U.S. 7, 9, 26 L.Ed. 998; The City of Alexandria, C.C., 28 F. 202; Bulkley v. Naumkeag Steam Cotton Company, 24 How. 386, 65 U.S. 386, 16 L.Ed. 599; Petersburg, N. N. & N. S. Line v. Norfolk-Virginia Peanut Co., 5 Cir., 172 F. 321, 24 L.R.A.,N.S., 569; Coyle v. Western Railroad Corp., 47 Barb., N.Y., 152, 154; McLeod Lumber Co. v. Crowley, D. C., 8 F.2d 283, 284.

Respondent contends that the cargo laden on board the lighter No. 122 had not been delivered to respondent for on-carriage at the time the damage by submergence was sustained, and cites in support of its contention: Inland Waterways Corp. v. Standard Commercial T. Co., 5 Cir., 65 F.2d 715; Hutchinson on Carriers, 3rd Edition, Vol. 1, Sections 131, 120, 119; Texas & Pacific Railway Co. v. Clayton, 173 U.S. 348, 19 S. Ct. 421, 43 L.Ed. 725; Texas & Pacific Railway Co. v. Callender, 183 U.S. 632, 637, 638, 32 S.Ct. 257, 46 L.Ed. 362; Goold et. al. v. Chapin et. al., 20 N.Y. 259, 75 Am.Dec. 398; Michigan Cent. R. v. Mark Owen & Co., 256 U.S. 427, 41 S.Ct. 554, 65 L.Ed. 1032; The Cordillera, 6 Fed.Cas. p. 545, No. 3,299 a; McLeod Lumber Co. v. Crowley, D. C., 8 F.2d 283.

■ From a careful reading of the cases cited by both sides, neither time nor space permitting of the separate consideration in this opinion of each case so cited, it seems clear to me that the case at bar is distinguished from one involving a freight car, which is generally sealed; that this case is that of an on-carrier under the Interstate Commerce Act, and is clearly distinguished from a case where the delivery is being made for a shipment and a bill of lading is to be given; that in this case the discharging of the cargo onto the dock or ship was the duty of the respondent, and; that for libellants to make delivery it was not necessary for them to discharge the cargo on the dock; that it was not necessary for the libellants to have obtained a receipt from respondent's receiving clerk; that a delivery was tendered, but not made by the placing of the lighter at Pier 34, and delivering the transfer papers to the respondent's receiving clerk; that respondent had the right to inspect the exterior of the cargo to be on-carried; that some statement or act of the respondent was necessary to show delivery; that the Lighter No. 122 was tendered with the cargo in good seaworthy condition on board, which included the two shipments; that respondent when it, after having the transfer papers on both shipments, commenced the discharge of the cargo laden thereon, in the forward part of the house on deck, took complete possession and control of the No. 122, and the cargo both in the forward portion of the house on deck, and in the stern portion; that it also unloaded the barge No. 333 across the No. 122, and when it had finished for the day, after discharging that portion of the cargo in the forward portion of the house, the respondent retained possession of the No. 122, with that portion of her cargo here in question still on board, moved her with the No. 333 for its own convenience across the slip, so that the No. 122 lay between the No. 333 and the respondent's barge Belton, which lay on the south side of Pier 36, and was thereafter with the cargo submerged.

The taking complete possession and control of the No. 122 by the respondent, and discharging the portion of the cargo in the forward portion of the house, constituted delivery by the libellants, and acceptance by the respondent of delivery, and from that time until the cargo in question was submerged, the same was in the custody of the respondent, and under the control of the respondent, and respondent is liable to libellants for the amount paid by the libellants to the shipper thereof.

The first notice of danger came to the respondent's representative on the pier, but respondent did nothing to prevent or reduce the damage.

Libellants, it is true, received notice from respondent's representative on the pier, that the boat was sinking, and did all that it

could, under the circumstances, to reduce the damages.

A decree may be entered in favor of the libellants, against the respondent, for $6,-606.21, with interest from the 27th day of March, 1939.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law, in accordance with this opinion.